# EXHIBIT A

Raymond A. Bragar (RB 1780)
MORGENSTERN & BLUE, LLC
885 Third Avenue
New York, NY 10022
(212) 750-6776
Attorneys for Plaintiff



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| VEN-CO PRODUCE INC., Plaintiff, - vs. - CSX TRANSPORTATION, INC. Defendant. | CASE NO. 10-CV-6904 Judge Sullivan **COMPLAINT** Plaintiff demands a jury trial |
|---|---|

Plaintiff Ven-Co Produce Inc. ("Ven-Co"), by its attorneys Morgenstern & Blue, LLC for its complaint against defendant CSX Transportation, Inc. ("CSX") alleges:

**Jurisdiction and Venue**

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as Ven-Co is a citizen of New York and CSX is a citizen of Virginia and Florida and the sum in controversy, exclusive of interest and costs, exceeds $75,000.

2. Venue is proper in the Southern District of New York because, for purposes of venue pursuant to 28 U.S.C. § 1391(c), CSX resides in the Southern District of New York as CSX was subject to personal jurisdiction in New York state at the time this action was commenced.

## NATURE OF THE ACTION

3. This is an action for slander intentionally aimed at Ven-Co's main business. The slander caused Ven-Co to go out of business after 28 years of success.

### Parties

4. Plaintiff Ven-Co is a New York corporation with its principal place of business in the Bronx, New York. Prior to March, 2010, Ven-Co was in the business of selling produce at wholesale from the Hunts Point Produce Market in the Bronx, New York.

5. Defendant CSX is a Virginia corporation with its principal place of business in Jacksonville, Florida. CSX is a national railroad engaged in the shipment of, among other things, produce.

### Background

6. The Hunts Point Market in the Bronx, New York has 45 to 50 wholesale venders of a variety of produce. Ven-Co had been in business since 1982 at the Hunts Point Market. 33% of Ven-Co's business was the sale of one exclusive brand of Idaho potatoes known as GPOD potatoes. Ven-Co was one of only seven vendors in the Hunts Point Market that sold GPOD potatoes. In Ven-Co's fiscal year of July, 2008 through June, 2009, it had total sales of $14,253,812.49 of which $4,807,643.50 were sales of GPOD potatoes.

7. GPOD shipped its potatoes from Idaho. The Union Pacific railroad picked up the railroad cars of potatoes in Idaho and delivered the cars to Chicago, where CSX then transported the cars to New York. Ven-Co paid CSX

for the all the transportation and CSX then paid Union Pacific. Prior to July, 2010, Ven-Co normally would order and receive about three cars of GPOD potatoes a week. In July, 2009, Ven-Co had credit with CSX that permitted Ven-Co to receive its potatoes and pay CSX over time. Most of Ven-Co's relations with CSX were through a CSX representative, Brian Dowd, located in Cranbury, New Jersey. In 2009, Ven-Co also dealt with Ted Johnson and Kay Fearrington of CSX in Jacksonville, Florida.

8. Ven-Co purchased its potatoes from GPOD on credit. It had 45 days from shipment date to pay for the potatoes. As Ven-Co was ordering nearly $3 million a year in GPOD potatoes, the 45 days time to pay for the potatoes was a critical element of Ven-Co's business. This extension of credit was especially important in the summer of 2009, when credit availability to small businesses such as Ven-Co was greatly limited, if not eliminated, by the consequences of the crash of the credit market following the events of September 15, 2008 and thereafter.

9. All of Ven-Co's communications with GPOD through 2009 occurred with GPOD's agent, Canyon Sales, and, in particular, one Al Mattie, a sales agent for GPOD located in the Hunts Point Produce Market. Generally, Ven-Co would telephone Mr. Mattie once a week on Thursdays, to order GPOD potatoes for the following week. Generally every Friday, Mr. Mattie would personally come to Ven-Co to pick up the 45 day payment for GPOD.

10. On July 2, 2009, Ven-Co telephoned Mr. Mattie to place an order for two super cars (3,700 packages per car) of GPOD potatoes.

11. On July 6, 2009, Ven-Co had orders outstanding for CSX to deliver four different cars of produce, including one car of GPOD potatoes. On that day, Susan Walsh a/k/a Susan Walsh-Enloe, an employee of CSX, operating out of a State of Washington CSX office, and in the course of her official duties, called Ryan Bybee, Sales Manager of GPOD, and told him that Ven-Co had no credit with CSX and that, as a result, if GPOD shipped its potatoes to Ven-Co, GPOD would have to pay for the freight because if left on the railroad cars, the product would spoil. Not only had Ven-Co never dealt with Susan Walsh, or any Washington State CSX office, the statement that Ven-Co lacked credit with CSX was false. In fact CSX shipped on credit to Ven-Co all four cars of produce that were outstanding on July 6, 2009.

12. Susan Walsh's false and defamatory statement to GPOD was intentionally made to injure Ven-Co's relations with GPOD. By July 2009, it was common knowledge that credit was difficult, if not impossible, to obtain for businesses the size of Ven-Co. Susan Walsh therefore knew, or recklessly disregarded the fact that misrepresentations as to Ven-Co's creditworthiness would be materially damaging to the ability of Ven-Co to purchase GPOD potatoes and to successfully operate its business. Specific proof of the maliciousness of the statement is that Susan Walsh called only GPOD, one of four produce suppliers, who were shipping goods on CSX to Ven-Co. If Susan Walsh were not acting maliciously, she would have called all four suppliers of produce if, in fact, there was any question about Ven-Co's creditworthiness with CSX. Furthermore, Susan Walsh knew, or recklessly disregarded the fact that

her statement, that if GPOD shipped the potatoes, GPOD had to pay for the freight otherwise the product would spoil, was false. First, Ven-Co had credit. Second, even if Ven-Co lacked credit, Ven-Co could pay for the shipment after it left and the shipment would not have spoiled.

13. As a result of Susan Walsh's false statements to GPOD, on July 7, 2009, GPOD faxed a letter to Mr. Mattie, who personally delivered the letter to Ven-Co informing Ven-Co that GPOD would ship only one car of potatoes a week provided that Ven-Co paid by check before the car was shipped.

14. Upon receipt of the July 7th fax, Ven-Co met with Al Mattie to see if the terms of the July 7th fax could be changed. In fact, Mr. Mattie agreed that GPOD would ship one car, instead of three, and would give Ven-Co 30 days to pay, but informed Ven-Co that its payment would have to be all up front starting in the next season, which commenced on or about September 1, 2009.

15. As a result, Ven-Co received two cars of GPOD potatoes in July, 2009 and one car of GPOD potatoes in August, 2009. Thereafter, Ven-Co quickly ran out of GPOD potatoes to provide its customers. Susan Walsh's false statement seriously damaged the operation of Ven-Co.

16. The dramatic fall off in its business precluded Ven-Co from having the cash to order GPOD potatoes in or after October, 2009. As a result, Ven-Co's $14.3 million a year business in 2008-2009 fell to $ 5.1 million for the year July, 2009 through June, 2010 and Ven-Co could not afford to remain in business. On June 9, 2010, Ven-Co ceased selling produce, solely as a result of CSX's defamatory telephone call to GPOD.

5

### FIRST CAUSE OF ACTION
### (Slander)

17. Incorporates by reference the allegations contained in paragraphs 1 through 16 of this Complaint.

18. CSX is responsible for the actions of its employee, Susan Walsh, in the official conduct of her business.

19. Susan Walsh, in the official conduct of her business for CSX, slandered Ven-Co on July 6, 2009, when she falsely told Ryan Bybee of GPOD that Ven-Co lacked credit with CSX and if GPOD shipped its potatoes to Ven-Co, GPOD had to pay for the freight or the product would remain on the rail and spoil.

20. This defamatory statement was directed at the heart of Ven-Co's business with the intent of cutting Ven-Co off from its primary supplier of produce.

21. As a result, Ven-Co is entitled to compensatory and special damages to be determined at trial, but in excess of $2,500,000.

### SECOND CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage)

22. Incorporates by reference the allegations contained in paragraphs 1 through 16 of this Complaint.

23. Ven-Co had a profitable ongoing business relationship with GPOD.

24. CSX, through its employee, Susan Walsh, intentionally sought to interfere with Ven-Co's relationship with GPOD by its wrongful conduct of making misrepresentations as to Ven-Co's creditworthiness. Alternatively, CSX, through

its employee Susan Walsh, acted with reckless disregard thereby interfering with Ven-Co's relationship with GPOD by its wrongful conduct of making misrepresentations as to Ven-Co's creditworthiness.

25. This misrepresentation was directed at the heart of Ven-Co's business and resulted in Ven-Co being eliminated by GPOD as a key supplier of produce.

26. As a result, Ven-Co is entitled to damages to be determined at trial, but in excess of $2,500,000.

WHEREFORE, Plaintiff Ven-Co demands judgment against defendant CSX as follows:

    a. Awarding compensatory and special damages to be determined at trial, but in excess of $2,500,000 plus pre and post judgment interest thereon;

    b. Awarding plaintiff costs, and disbursements;

    c. Granting plaintiff such other, further, and different relief as this Court deems just and proper.

Dated: October 1, 2010

MORGENSTERN & BLUE, LLC

By: /s/ Raymond A. Bragar
Raymond A. Bragar (RB 1780)
885 Third Avenue
New York, NY 10022
(212) 750-6776
bragar@bragarwexler.com
Attorneys for plaintiff

# AFFIDAVIT OF SERVICE

State of New York )
                          ) ss:
County of New York )

      Nathan Monroe-Yavneh, being duly sworn, deposes and says:

      1. That deponent is not a party to the action, is over 18 years of age and resides in New York, New York.

      2. That on October 1, 2010, deponent served the within COMPLAINT upon:

Sean C. Sheely
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
sean.sheely@hklaw.com

Frank Morreale
Zachary R. Potter
HOLLAND & KNIGHT LLP
50 N. Laura St., Ste. 3900
Jacksonville, FL 32202
frank.morreale@hklaw.com
zachary.potter@hklaw.com

*Attorneys for Defendant*

at the addresses designated by said party for that purpose via electronic mail and First Class Mail.

                                                    Nathan Monroe-Yavneh

Sworn to before me on this 1st
day of October 2010

Notary Public

JUSTIN KUEHN
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY
LIC. #02KU6200441
COMM. EXP. FEBRUARY 2, 2013